United States Bankruptcy Court
Southern District of Texas

**ENTERED**

May 19, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 15-34287** |
| **BLACK ELK ENERGY OFFSHORE** | § | |
| **OPERATIONS, LLC**, *et al.*, | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **RICHARD SCHMIDT,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 18-3386** |
| | § | |
| **TWOSONS CORPORATION**, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

The Litigation Trustee alleges that Twosons Corporation and its owners, Fabrice and Raphael Harari, received a $15,400,152.42 fraudulent transfer and participated in a conspiracy to take $97,959,854.79 from Black Elk Energy Offshore Operations, LLC. The Defendants moved to dismiss. For the reasons set forth below, the motion to dismiss is denied.

## BACKGROUND

### I.   FACTUAL BACKGROUND

In a lengthy Amended Complaint, the Litigation Trustee describes improper dealing, corporate fraud, and preferential treatment culminating in the wrongful taking of $97,959,854.79 from Black Elk Energy Offshore Operations, LLC. (ECF No. 56).

### A.   Platinum Partners and Twosons Corporation

Platinum Partners ("Platinum") is a group of hedge funds founded by Mark Nordlicht and Murray Huberfeld. (ECF No. 56 at 14). At all relevant times, Nordlicht and Huberfeld allegedly

controlled Platinum.  (ECF No. 56 at 14).  The core Platinum hedge fund is Platinum Partners

Value Arbitrage Fund LP ("PPVAF").  (ECF No. 56 at 14).  Other relevant Platinum funds include

Platinum Partners Credit Opportunities Master Fund LP ("PPCO"), Platinum Partners Liquid

Opportunity Master Fund LP ("PPLO"), and PPVA Black Elk (Equity) LLC ("PPVABE").  (ECF

No. 56 at 5).  In the Spring of 2013, Platinum members created Platinum Partners Black Elk

Opportunities Fund LLC ("PPBEO") and Platinum Partners Black Elk Opportunities Fund

International LLC ("PPBEOI," and together with PPBEO, "PPBE").  (ECF No. 56 at 5, 52–53).

Twosons Corporation is a Panamanian corporation principally owned by father and son

Raphael and Fabrice Harari ("Fabrice," "Raphael," the "Hararis," and together with Twosons, the

"Defendants").  (ECF No. 56 at 27).  The Hararis reside in Switzerland and have owned and

managed multiple companies.  (ECF No. 56 at 10, 27–28).  The Trustee alleges that Twosons was

"organized and operated as a mere tool or business conduit of the Hararis."  (ECF No. 56 at 22).

The Hararis allegedly (i) control Twosons; (ii) treated Twosons' investments as their own personal

investments; and (iii) have a unity of interests with Twosons such that Twosons does not truly

exist alone.  (ECF No. 56 at 22).  In addition, Twosons allegedly does not have a functioning board

of directors and is now an empty shell.  (ECF No. 56 at 25, 36).

Huberfeld and Fabrice were close personal friends and business associates from at least

2009 to 2016.  (ECF No. 56 at 29).  Fabrice introduced Platinum members to potential investors

from Europe and Israel in 2011 and 2012.  (ECF No. 56 at 32).  Additionally, the Trustee alleges

that the Hararis personally invested over $10 million in various Platinum investments funds, from

which they received above-market returns in 2011 and 2012.  (ECF No. 56 at 33).  In return,

Platinum principals introduced the Hararis to potential U.S. investors with respect to the Hararis'

pharmaceutical company and guaranteed the Hararis' investments in Platinum, often with unusually high returns.  (ECF No. 56 at 33).

### B.    Black Elk and Platinum

Black Elk was an oil and gas company headquartered in Houston, Texas.  (ECF No. 56 at 12).  Black Elk acquired, exploited, and developed properties that other oil and gas companies desired to remove from their producing property portfolios.  (ECF No. 56 at 12).  From 2008 to 2011, Black Elk expanded via acquisitions.  (ECF No. 56 at 12).  To finance its operations, on November 23, 2010, Black Elk issued $150 million of debt to "Senior Secured Noteholders."  (ECF No. 56 at 12–13).  Black Elk granted the Senior Secured Noteholders a first priority lien on substantially all of its assets.  (ECF No. 56 at 13).  On November 23, 2012, an explosion on an offshore Black Elk platform killed three workers.  (ECF No. 56 at 5).  Black Elk's business began to decline after the negative impact of the explosion and worsening market conditions.  (ECF No. 56 at 5).  As of December 31, 2012, Black Elk had a net working capital deficit of approximately $71.7 million.  (ECF No. 56 at 57).  The deficit ballooned to $109.5 million a year later.  (ECF No. 56 at 57, 64).  Black Elk created Black Elk Series E preferred equity in the Spring of 2013 to obtain more capital.  (ECF No. 56 at 5–6).

Platinum had become Black Elk's primary and controlling investor in 2009.  (ECF No. 56 at 5).  As of December 31, 2013, Platinum owned approximately 85% of Black Elk's outstanding voting membership interests and approximately 66% of Black Elk's total outstanding membership interests.  (ECF No. 56 at 37).  According to Black Elk's former CEO, Platinum was in complete control of "almost every daily activity" as of February 2014.  (ECF No. 56 at 38).

### C.      Renaissance Sale

On August 15, 2014, Black Elk closed a sale of certain assets to Renaissance Offshore, LLC (the "Renaissance Sale"), from which Black Elk received approximately $125 million in net proceeds.   (ECF No. 56 at 39).   While under the control of Platinum, Black Elk used the Renaissance Sale proceeds to retire Black Elk's Series E preferred equity units.   Under the relevant agreements, the proceeds should have been used to retire Senior Secured Notes or trade debt.[1] (ECF No. 56 at 39).

Platinum diverted the Renaissance Sale proceeds by an improper[2] Offer to Purchase and Consent Solicitation (the "Solicitation").   (ECF No. 56 at 39).   The Solicitation sought approval of an amendment to the indenture governing the Senior Secured Notes that allowed most of the Renaissance Sale proceeds to be used to retire the Series E preferred equity.   (ECF No. 56 at 39). A majority of the non-Platinum-affiliated Senior Secured Noteholders had to consent for the amendment to succeed.   (ECF No. 56 at 39).   Platinum caused the following representation to appear in the Solicitation:

> As of the date hereof [July 16, 2014], there are $150 million aggregate principal amount of Notes issued and outstanding under the Indenture. Platinum Partners Value Arbitrage Fund L.P. and its affiliates, which own approximately 85% of our outstanding voting membership interests, own approximately $18,321,000 principal amount of outstanding Notes. Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, held any Notes.

---

[1] Twosons purchased $10 million of Black Elk's Series E preferred equity through PPVABE for a guaranteed 20% return and quarterly dividends in April 2013.  (ECF No. 56 at 58).

[2] A jury convicted Nordlicht and David Levy, Huberfeld's nephew and Beechwood's CIO, of conspiracy to commit securities fraud, conspiracy to commit wire fraud, and securities fraud in connection with this solicitation. *United States v. Landesman*, 17 F.4th 298 317 (2d Cir. 2021).  Despite the jury convictions, the United States District Court for the Eastern District of New York granted Levy's motion for a judgment of acquittal and conditionally granted his motion for a new trial.  *Id.*  The court also granted Nordlicht's motion for a new trial.  *Id.*  The Second Circuit vacated the district court's order and judgment.  *Id.* at 342.  Nordlicht and Levy recently filed a petition for a writ of certiorari.

(ECF No. 56 at 39‑40).  The last sentence was false and designed to disguise Platinum's scheme

to fix the vote.  (ECF No. 56 at 40).  Platinum, acting through Nordlicht, Levy, and others, engaged

in a scheme to fix the vote by disclaiming a beneficial interest in $43,293,000 of Notes that

Platinum beneficially owned.  (ECF No. 56 at 41).  Platinum achieved this consent by directing

affiliated but undisclosed "Beechwood" entities to vote in favor of amending the indenture.[3]  (ECF

No. 56 at 41).  The Beechwood entities voted approximately $37,017,000 worth of Notes in favor

of the Platinum scheme despite being against the Beechwood entities' economic interests.  (ECF

No. 56 at 42).

### D.    Fraudulent Transfers

Between August 18 and 21, 2014, Black Elk made several wire transfers, including:

$32,563,819.73 to PPVABE; $15,332,672.97 to PPVAF; $24,600,584.31 to PPCO; and

$5,000,000.00 to PPLO.  (ECF No. 56 at 48–49).  Those entities immediately transferred the funds

to PPBE.  (ECF No. 56 at 50).  PPBE distributed the funds to its investors, including the

Defendants.[4]  (ECF No. 56 at 50–51, 80).  Twosons received a total of $15,400,152.43 on August

21, 2014, which was allegedly then transferred to the Hararis.  (ECF No. 56 at 81, 88).  The

Defendants were allegedly aware of Black Elk's and Platinum's financial troubles, and they agreed

that they would be paid once the Renaissance Sale closed and Platinum protected its interests.

(ECF No. 56 at 51).

---

[3] The Beechwood entities were owned in substantial part by Platinum principals, associates, and others
associated with them.  (ECF No. 56 at 41).  In fact, key employees worked for Platinum and Beechwood at the same
time.  (ECF No. 56 at 41).

[4] The Trustee only alleges that Twosons purchased Black Elk's Series E preferred equity through Twosons
and that Twosons later transferred what it received to the Hararis: "[T]he Trustee has avoided the initial transfers . . .
of Renaissance Sale proceeds, which Black Elk transferred to Platinum and Platinum improperly transferred to PPBE,
then to Twosons, and then Twosons transferred to the Hararis."  (ECF No. 56 at 88).

## II.   PROCEDURAL BACKGROUND

On August 11, 2015, several creditors filed an involuntary chapter 7 bankruptcy petition against Black Elk.  (Case No. 15-34287, ECF No. 1).  At Black Elk's request, the case was converted to chapter 11.  (Case No. 15-34287, ECF No. 69).  The Court confirmed Black Elk's third amended plan of liquidation on July 13, 2016.  (Case No. 15-34287, ECF No. 1204).

On October 26, 2016, the Trustee initiated an adversary proceeding against PPVABE, PPVAF, PPCO, and PPLO to avoid and recover the initial fraudulent transfers Black Elk made at the direction of Platinum entities.  (Case No. 16-03237, ECF No. 1 at 1–2).  On December 19, 2016, the U.S. Attorney for the Eastern District of New York unsealed an eight-count indictment against individuals affiliated with Platinum entities.  (Case No. 16-03237, ECF No. 1 at 11).  The U.S. District Court for the Eastern District of New York placed PPCO, PPLO, and other Platinum entities in a receivership and liquidators were appointed (the "Joint Liquidators").  (Case No. 16-03237, ECF No. 83 at 7, 17).  The Trustee then stipulated to the dismissal of PPCO and PPCO in the adversary proceeding.  (Case No. 16-03237, ECF Nos. 89; 114).  This Court entered interlocutory default judgments against PPVAF in the amount of $15,332,672.97 and against PPVABE in the amount of $154,500,000.00 on September 20, 2018.  (Case No. 16-03237, ECF No. 121).

On August 31, 2017, the Trustee initiated an adversary proceeding against PPBEO and PPBEOI to avoid and recover the secondary fraudulent transfers PPVABE, PPVAF, PPCO, and PPLO made to PPBEO and PPBEOI.  (Case No. 17-03380, ECF No. 26 at 5–6).  The Court entered default judgments against PPBEO in the amount of $32,802,572.16 and against PPBEOI in the amount of $39,022,229.15 on June 27, 2018.  (Case No. 17-03380, ECF No. 46).

The Trustee initiated this adversary proceeding against Twosons on November 30, 2018. (ECF No. 1).  On March 15, 2019, the Trustee issued a subpoena for Platinum documents from the Joint Liquidators and received the first production on May 13, 2019.  (ECF No. 91 at 7).  Those documents provided enough information for the Trustee to bring claims against the Hararis.  The Court allowed the Trustee to amend the Original Complaint and the Trustee added the Hararis as co-defendants.  (ECF No. 56).  The Amended Complaint contains six claims for relief:

**Count I**: The transfers from Black Elk to Platinum entities were actual fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) and may be avoided.[5]  (ECF No. 56 at 83–84).

**Count II**: The transfers from Black Elk to Platinum entities were constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) and may be avoided.[6]  (ECF No. 56 at 84–85).

**Count III**: The transfers from Black Elk to Platinum entities were made in violation of the Texas Uniform Fraudulent Transfer Act ("TUFTA").  (ECF No. 56 at 85–87).  Under 11 U.S.C § 544(b), a transfer may be avoided if it is voidable under TUFTA.[7]  (ECF No. 56 at 86).

**Count IV**: The avoided transfers under Counts I, II, and III may be recovered from any immediate or mediate transferee of the initial transferee under 11 U.S.C. § 550.  (ECF No. 56 at 88).

**Count V**: The Defendants participated in a conspiracy to commit the fraudulent transfers and breaches of fiduciary duty.  (ECF No. 56 at 88–89).  The Defendants are jointly and severally

---

[5] The Trustee "pled this Count as a predicate for recovery of the transfers to the Defendants Under Counts III and IV."  (ECF No. 56 at 84).

[6] The Trustee "pled this Count as a predicate for recovery of the transfers to the Defendants Under Counts III and IV."  (ECF No. 56 at 85).

[7] Like Counts I and II, Count III appears to be a predicate for Count IV, though the Trustee did not indicate as much.  Count III's reference to § 544(b) allows the Trustee to avoid a transfer under applicable state law.  Section 550—the thrust of Count IV—permits the Trustee to recover the value of the transferred property under §§ 544 and 548.

liable for the entire $97,959,854.79 initial fraudulent transfer and are liable for punitive damages. (ECF No. 56 at 82, 89).

**Count VI**: Twosons is the Hararis' alter ego and the corporate veil should be pierced.  (ECF No. 56 at 90).  Thus, the Hararis should be deemed individually and jointly and severally liable for Twosons' liabilities to Black Elk.  (ECF No. 56 at 90).

The Defendants moved to dismiss the Amended Complaint on December 6, 2019, and the parties argued the motion on February 25, 2021.  (ECF Nos. 62; 81).  The Hararis seek the dismissal of every Count, arguing, *inter alia*, that the Court has no personal jurisdiction, the Trustee cannot pierce the corporate veil, and the statute of limitations bars the Trustee on Count IV.  (ECF No. 62).  Twosons seeks the dismissal of Counts I, V, VI, and the portion of Count III related to an actual fraudulent transfer.  (ECF No. 62).  The Court conducted an evidentiary hearing on equitable tolling and the statute of limitations on June 7, 2021 and took the motion under advisement.  (ECF No. 85).

## LEGAL STANDARD

The Court reviews motions under Rule 12(b)(6) "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs."  *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).  However, the Court will not strain to find inferences favorable to the plaintiff.  *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

To avoid dismissal for failure to state a claim, a plaintiff must meet the pleading requirements set out in Federal Rule of Civil Procedure 8(a).  Rule 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  In *Ashcroft v. Iqbal*, the Supreme Court held that Rule 8(a)(2) requires that "well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct."  556 U.S. 662, 679

(2009) (quoting FED. R. CIV. P. 8(a)(2)).  "Only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (quoting *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)).

Fraud claims must, in addition, meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements.  Under Rule 9(b), fraud claims must be alleged with particularity concerning the circumstances of the fraud.  FED. R. CIV. P. 9(b); *see Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 195 (5th Cir. 1996) (upholding district court dismissal of fraud claims where plaintiff failed to allege when a fraudulent sales charge was incurred or the extent of plaintiff's damages); *Red Rock v. JAFCO Ltd.*, 1996 WL 97549, at *3 (5th Cir. Feb. 16, 1996) (holding that plaintiff's allegations did not satisfy Rule 9(b) where they failed to allege the time, place, or content of any misrepresentations).  "To plead fraud adequately, the plaintiff must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 (5th Cir. 2010) (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This adversary proceeding seeks to recover fraudulent transfers and is therefore a core matter under 28 U.S.C. § 157(b)(2)(H).  Venue is proper in this District consistent with 28 U.S.C. §§ 1408 and 1409.

I.      PERSONAL JURISDICTION

The Hararis seek dismissal of the entire Amended Complaint because the Court allegedly has no personal jurisdiction over them.  (ECF No. 62 at 19).  The party invoking the jurisdiction of the Court has the burden establishing jurisdiction.  *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006).  At the pre-evidentiary hearing stage, the Trustee meets his burden to establish that the Court has personal jurisdiction over the Hararis if he makes a *prima facie* showing of jurisdiction.  *Id.*; *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008); *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

A.      **Specific Personal Jurisdiction**

The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant when: (1) the defendant has "minimum contacts" with the forum; and (2) the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945); *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 813 (5th Cir. 2006).  A defendant's "minimum contacts" may give rise to either general or specific personal jurisdiction.  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) ("[We recognize] two kinds of personal jurisdiction: general . . . jurisdiction and specific . . . jurisdiction.").  The Court may exercise specific jurisdiction when a plaintiff's claims arise out of, or are related to, the defendant's forum contacts.  *Id.* at 1025; *Burger King*, 471 U.S. at 472–73 (finding that a forum may assert specific jurisdiction over an out-of-state defendant if "the defendant has 'purposefully directed' his activities at residents of the forum, . . . and the litigation results from alleged injuries that 'arise out of or relate to' those activities.").

To support a finding of specific jurisdiction, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (citing *Burger King*, 471 U.S. at 475); *see IFS*, 2009 WL 3063353, at *2 (citing *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n.21 (5th Cir. 1981)) ("[A]n action arises from or relates to contacts if the cause would not have arisen but for those contacts."). The minimum contacts analysis examines the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there. *Walden,* 571 U.S. at 285 (citing *Int'l Shoe*, 326 U.S. at 311); *see Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *Tutus, L.L.C v. JLG Indus., Inc.*, No. 21-20383, 2022 WL 1517044, at *1 (5th Cir. May 12, 2022) (quoting *Walden*, 571 U.S. at 284 ("Jurisdiction requires more than 'random, fortuitous, or attenuated contacts [the defendant] makes by interacting with other persons affiliated with the State.'")); *Stuart v. Spademan*, 772 F.2d 1185, 1190 (5th Cir. 1985) (citing *Helicopteros*, 104 S.Ct. at 1872) ("When a controversy is related to or arises out of a nonresident's contacts with the forum, the minimum-contacts inquiry focuses on the relationship among the defendant, the forum, and the litigation."). Finally, the plaintiff cannot be the only link between the defendant and the forum. Rather, it is "the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden*, 571 U.S. at 285; *Ford Motor*, 141 S.Ct at 1025 (quoting *Walden*, 571 U.S. at 285) ("[The defendant's contacts] must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there.").

The parties disagree whether the Hararis' contacts with the United States as corporate officers should be attributed to their personal minimum contacts analysis. *See Stuart*, 772 F.2d at 1197 (defining a defense that "an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation" as the "fiduciary-shield doctrine."). In a veil piercing scenario, it would make no sense to require the assertion of personal jurisdiction to *exclude* the conduct that gives rise to the claim. If conduct—ostensibly undertaken as a corporate officer— was undertaken to use the corporate shield to perpetrate a fraud, that conduct may be considered. The fiduciary shield doctrine is a discretionary equitable doctrine that certain states have employed to limit their jurisdictional reach under their state constitutions and long-arm statutes. *Teknek*, 354 B.R. at 195–96 (collecting cases). However, the fiduciary shield doctrine is not a limitation imposed by federal constitutional law, which is what the Court is dealing with in this proceeding. *See id.* at 196. Therefore, the Court will consider the Hararis' specific contacts regardless of whether they were made while representing Twosons.

The Supreme Court has found that specific personal jurisdiction may exist where the cause of action stems from foreign conduct that has effects in the forum state. *See Calder v. Jones*, 465 U.S. 783, 785–86 (1984). In *Calder*, California libel law potentially rendered a reporter and an editor for the National Enquirer liable in California because they researched and published an allegedly false article about the plaintiff's life in California. *Id.* at 788–89. The reporter traveled to California for business, but did most of his research in Florida and relied on phone calls to sources in California for the information in the article. *Id.* at 785. The other defendant, the president and editor of National Enquirer, traveled to California once for pleasure and once to testify in an unrelated trial. *Id.* at 786. The Supreme Court found that California was the focal

point of the story and the harm suffered, so jurisdiction over both defendants was proper in California because of the effects of their Florida conduct. *Id.* at 789. The defendants' intentional and allegedly tortious actions were expressly aimed at California. Thus, they must have reasonably anticipated being haled into court there to answer for the truth of their statements. *Id.* at 789–90. "Contacts" need not necessarily be physical contacts between the defendant and the forum state. *See Teknek,* 354 B.R. at 197. *But see Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318, 320 (5th Cir. 2021) (finding no specific jurisdiction where an article did not target Texas "specifically and knowingly. . . . At bottom, the only reason to hale HuffPost into Texas is that Texans visited the site, clicking ads and buying things there. But . . . those visits reflect only HuffPost's universal accessibility, not its purposeful availment of Texas.").

In a securities fraud case, the United States District Court in the Northern District of Texas found that foreign nationals had sufficient minimum contacts when they (i) contacted a financial advisor in Miami; (ii) placed funds from a liquidated trust in a United States bank; (iii) made numerous phone calls and sent numerous emails to their Miami financial advisor; and (iv) used proceeds to purchase real property in the United States. *Janvey*, 2012 WL 13093944, at *2. The bankruptcy court in the Southern District of New York determined that the plaintiff had shown a *prima facie* case of personal jurisdiction when the defendants' conduct caused injury in New York in connection with agreements with a New York-based broker-dealer who established "New York trading accounts for the purpose of investing in securities traded on the United States stock markets." *Picard v. Estate of Igoin (In re Bernard L. Madoff Inv. Sec. LLC)*, 525 B.R. 871, 885 (Bankr. S.D.N.Y. 2015).

(1)   *Raphael Harari*

The Trustee has made a *prima facie* showing of specific personal jurisdiction over Raphael Harari.  In support of the claim that Raphael has minimum contacts with the United States, the Trustee identifies emails showing that Raphael invested in Platinum entities along with Twosons, indicating that Raphael invested in funds located in the United States in his personal capacity from at least 2009 to 2016.  (*See, e.g.*, ECF Nos. 56 at 34; 56-4; 56-6 at 2, 3).  In what appears to be an internal Platinum e-mail, a Platinum affiliate indicates that "Raphael Harari" is an "investor" as of January 4, 2012.  (ECF No. 56-34).  The Trustee alleges this investment was made in 2011 for Black Elk's Class D Preferred Units.  (ECF No. 72-1 at 2).  The Hararis agreed to extend the investment for two months on December 20, 2011, and for three more months on March 2, 2012.  (ECF Nos. 56-33; 56-35).

On May 2, 2012, Joel Edelstein, a Platinum affiliate, emailed Fabrice indicating that Raphael and Twosons were invested in "Platinum Partners Value Arbitrage" and would make withdrawals at various points in May and June of 2012.  (ECF No. 56-10).

On June 3, 2012, Benjamin Uzan, a Harari affiliate, emailed Edelstein that Twosons and Raphael wished to withdraw the excess over $2,000,000 in Twosons' account and the excess over $5,000,000 in Raphael's account out of PPVAF by July 1, 2013.  (ECF No. 56-12).

On December 9, 2013, Edelstein emailed Uzan that Platinum was wiring payments and referenced account balances for Twosons and Raphael.  (ECF No. 56-3).

On January 11, 2013, Fabrice apparently agrees to an investment in a "Bayberry" fund of $2,000,000 on behalf of Raphael and $2,000,000 on behalf of Twosons.  (ECF No. 56-9 at 1).  Specifically, Fabrice invested "2 on RH individual and 2 on Twosons his company."  (ECF No. 56-9 at 1).  The Trustee alleges that Bayberry is a Platinum investment and is therefore an

investment in a fund in the United States: "The Hararis had personally invested more than $10 million into a number of Platinum investments and funds, including Bayberry, Centurion, Glacial, Marbridge, PPCO, and PPVAF" and "Platinum Partners is a group of Manhattan-based hedge funds . . . ."  (ECF No. 56 at 14, 33).

On February 18, 2013, Uzan indicates that Raphael desired to invest in Black Elk in his personal capacity: "Murray is suggesting we invest 0->5M$ in Black Elk . . . We would like to invest 6M$ (Twosons Corporation : 4M$ ; Raphaël Harari : 2M$)."  Uzan referenced that Raphael individually invested in the PPCO fund "for $3M since July 2011 and $1M since September 2011. . . . The Harari family [previously referred to as "Raphael Harari and Twosons"] would like to redeem their investment in the PPCO and assess for more aggressive investments, bearing better returns (like Black Elk or something else)."  (ECF No. 56-6 at 3).

On January 28, 2014, Uzan asked Edelstein "could you please give me the period until when we (RH + TWOSONS) are invested in [PPVAF]?"  (ECF No. 56-4).  PPVAF is a United States fund, and this e-mail appears to reference Raphael's personal investment.  (ECF No. 56 at 14).

Additionally, Raphael contacted Platinum members concerning Twosons' investments with Platinum funds.  (ECF No. 56-40).  Raphael invested in his personal capacity in United States funds and plausibly knew where the funds would go.  Raphael plausibly had a hand in discussing Twosons' investments with Platinum: on at least one occasion, he emailed Platinum members concerning Twosons' investment.  (ECF No. 56 at 36).  Ultimately, the funds he had a part in directing Twosons to invest assisted in the looting of Black Elk, and the Trustee's complaint is related to his involvement with Platinum entities.  Although the Trustee has not alleged Raphael set foot in the United States, his actions were expressly aimed at the United States.

The Trustee has made a *prima facie* case that Raphael purposefully directed investments in the United States via the United States-based Platinum entities that Raphael plausibly knew would go into Black Elk, and it would be reasonable for him to anticipate that any dispute regarding those investments might be litigated in the United States.

The Court recognizes that the Hararis challenge the accuracy and precision of some of the foregoing.  Those challenges are reserved for trial, not for a pre-trial motion practice.

> **(2)**   ***Fabrice Harari***

The Trustee presents several reasons why Fabrice Harari has sufficient contacts with the United States to establish specific personal jurisdiction.[8]  (ECF No. 72-1).  First, the Trustee alleges that Fabrice coordinated Raphael's investments with Platinum.  (*See, e.g.*, ECF Nos. 56-9; 56-10, 56-11).  Second, Fabrice traveled to New York to discuss investment strategy and options for Platinum investments in the United States with Huberfeld.  (ECF Nos. 56-37; 56-49 at 1).  Finally, Fabrice negotiated terms for Twosons' investments in Black Elk PPBE in 2013 and 2014.  (ECF No. 56 at 55, 67).  Fabrice could reasonably anticipate being haled into United States litigation concerning his contacts with the money he directed to be invested in fraudulent activity in the United States.  His contacts with the United States are sufficient for this Court to exercise specific personal jurisdiction.

Because the Trustee has made a *prima facie* showing of specific personal jurisdiction over the Hararis, the Court need not examine general personal jurisdiction.

---

[8] Some of the Trustee's reasons are unpersuasive.  For example, the Trustee alleges that Fabrice's use of Huberfeld's Florida residence is evidence of his minimum contacts with the United States.  The Trustee's claims do not arise out of, nor are they related to, Fabrice staying in Huberfeld's residence in Florida.  *Burger King*, 471 U.S. at 472–73 (finding that the Court may exercise specific jurisdiction when a plaintiff's claims arise out of, or are related to, the defendant's forum contacts).

### B.      Traditional Notions of Fair Play and Substantial Justice

The Trustee has made a *prima facie* showing that the Hararis have minimum contacts with the United States.  If the plaintiff successfully establishes "minimum contacts," the burden shifts to the defendant to establish that the exercise of jurisdiction would be inconsistent with traditional notions of fair play and substantial justice.  *IFS*, 2009 WL 3063353, at *8 (citing *Burger King*, 471 U.S. at 477).  The burden is not light. The defendant "must present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable."  *Id.* (citing *Burger King*, 471 U.S. at 477).

The factors bearing on the reasonable analysis are: (1) the burden that the exercise of personal jurisdiction will place on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering substantive social policies.  *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

This Court's exercise of personal jurisdiction over the Hararis would not be a burden on them.  The Hararis have already pursued litigation in the United States related to Platinum.  They are represented by the same counsel as Twosons.  Much of the discovery that the Trustee will seek against Twosons would still be focused on the Hararis and their control of Twosons.  The Hararis have provided no convincing argument that their physical or financial condition would make travel to Houston overly burdensome, especially when many, if not all, of their appearances may be done remotely.  Defending themselves against the Trustee's claims in this Court will not be an undue burden.  Lastly, this adversary proceeding was brought pursuant to federal bankruptcy laws and

within a federal bankruptcy case.  The United States has a substantial interest in enforcing its laws.  *IFS*, 2009 WL 3063353, at *9 (citing *Teknek*, 354 B.R. at 204).

## DISCUSSION

### I.   ACTUAL FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(A)(1)(A) AND THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT

The Trustee alleges that the Defendants are recipients of actual fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) and the Texas Uniform Fraudulent Transfer Act.  (ECF Nos. 56 at 83–87; 73 at 51–55).  The Defendants argue that the Trustee made contradictory arguments as to whether Black Elk made the transfers with fraudulent intent, and so has not made viable claims for actual fraudulent transfer.  (ECF Nos. 62 at 36–39; 75 at 27–29).

The Defendants argue that the Trustee alleged that a minority of the Black Elk managers acted with fraudulent intent to hoodwink the rest of the Board of Managers to authorize the redemption of the preferred equity.  (ECF No. 62 at 38).  Because only a minority of the managers authorized the redemption, Black Elk itself was innocent.  (ECF No. 62 at 39).  In reality, the Amended Complaint alleges that a *majority* of the Black Elk managers acted with fraudulent intent in the Renaissance Sale: "The Platinum-appointed Managers Small and Salfati, acting within the scope of their authority and binding Black Elk, approved and directed the Black Elk fraudulent transfers," and "Black Elk's Board of Managers had three members, and at least one was unaware of the number of Notes held and controlled by Platinum and Beechwood in August 2014."  (ECF No. 56 at 45).  Black Elk had three managers.  Two of the managers authorized a redemption against Black Elk's interests.  This constitutes a majority of the managers.  Only a minority of the managers had an "apparently innocent state of mind."  (ECF No. 62 at 38).  Under the Defendants' logic, their acts "impute that same malign intent to the company itself."  (*See* ECF No. 62 at 38).

While accusing the Trustee of "pure sophistry masquerading as legal reasoning," the Defendants assert that the following statements are contradictory:

> *See*, *e.g.*, FAC ¶ 115 and Clarified Response at pp. 99–101 ("Black Elk's participation in these acts [i.e., fraud on its bondholders] was limited to the actions of its Platinum-appointed Managers and CFO who, *though acting within the scope of their authority at Black Elk*, were acting solely for the benefit of Platinum and themselves, *and not Black Elk*. . . . [W]hile these individuals acted within the scope of their authority *and such acts are legally attributable to Black Elk*, those actions were taken adversely to the interests of Black Elk. . . ." (emphasis added)).

(ECF No. 75 at 28).  The Trustee does not allege that the acts cannot be attributed to Black Elk, but that Black Elk's participation stems from acts of the Platinum-appointed managers and CFO. Simply because the Platinum-appointed managers and CFO were acting within the scope of their authority for Black Elk does not contradict that the acts were adverse to Black Elk.  The Platinum-appointed managers may have acted against Black Elk's interests and within the scope of their authority as Black Elk managers.[9]

Aside from personal jurisdiction arguments, the Defendants present no other reasons why Counts I and III should be dismissed.  The Court dispensed with the personal jurisdiction arguments above.  The Defendants' other arguments are unpersuasive.  The motion to dismiss Count I and the actual fraudulent transfers portion of Count III is denied.

---

[9] Whether Rule 9(b)'s heightened pleading standard applies to fraudulent transfer claims remains undecided under Fifth Circuit precedent. *Life Partners Creditors' Tr. v. Crowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 118, 120 (5th Cir. 2019); *cf. In re Monteagudo*, 536 Fed. App'x. 456, 458 (5th Cir. 2013) ("Because fraud is an element of a § 523(a)(2)(A) action, Anderson was required to plead fraud in these actions.").  In any event, the Amended Complaint satisfies Rule 9(b)'s requirements.  The Trustee alleges that Platinum and Black Elk hatched a scheme to divert approximately ninety-eight million dollars of Renaissance Sale proceeds to the holders of Series E preferred equity.  Black Elk had an interest in the Renaissance Sale proceeds.  Approximately fifteen million dollars of that money made its way to the Defendants, via the PPBE Funds.  The Amended Complaint identifies the who, what, when, where, and how of the fraudulent transfers.  *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008).

II.   **CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(A)(1)(B) AND THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT**

The Trustee alleges that the Defendants are recipients of constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) and the Texas Uniform Fraudulent Transfer Act.  (ECF Nos. 56 at 84–87; 73 at 51–55).   Twosons' motion to dismiss does not seek the dismissal of Count II: "Defendants respectfully request that this Court grant their Motion in full and dismiss with prejudice all of the Trustee's causes of action against the Hararis and Twosons, except for the recovery of constructive fraudulent transfers against Twosons."  (ECF No. 62 at 11).  The Hararis seek to dismiss Count II solely because the Court has no personal jurisdiction over them.  (ECF No. 62).  The Court has determined that it has personal jurisdiction over the Hararis.  The motion to dismiss Count II and the constructive fraudulent transfers portion of Count III is denied.

III.   **RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550**

A significant portion of the dispute concerns the statute of limitations and equitable tolling.  Section 550 has a one-year statute of limitations.  11 U.S.C. § 550(f)(1) ("An action or proceeding under this section may not be commenced after the earlier of . . . one year after the avoidance of the transfer on account of which recovery under this section is sought.").   The parties agree that the relevant transfers were avoided on June 27, 2018.  (ECF Nos. 91 at 6; 94 at 2).  Thus, the § 550 action in Count IV should have been brought against the Hararis on or before June 27, 2019.  The Trustee had sufficient information to evaluate the potential legal claims against the Hararis on May 13, 2019—45 days prior to the statute of limitations expiration.  (ECF No. 82-11 at 7).  However, the Trustee did not seek to amend the complaint to include the Hararis until July 22, 2019—three weeks after the statutes of limitations expiration.  (ECF No. 82-11 at 7).  The Trustee claims that he is entitled to equitable tolling.  (ECF No. 82-11 at 7).

"Equitable tolling pauses the running of . . . a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014). Equitable tolling should be applied "sparingly" and depends on the facts and circumstances of each case.[10] *Granger v. Aaron's, Inc.*, 636 F.3d 708, 712 (5th Cir. 2011) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)); *Clarke v. Rader*, 721 F.3d 339, 344 (5th Cir. 2013) (citing *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir.1999)). "Equitable tolling does not lend itself to bright-line rules." *Clarke*, 721 F.3d at 344. However, certain sources of delay do not create "extraordinary circumstances" warranting equitable tolling, such as excusable neglect or delays of the plaintiff's own making. *Id.* The party invoking equitable tolling bears the burden of proof. *Granger*, 636 F.3d at 712; *Morton v. Kievit (In re Vallecito Gas, LLC)*, 461 B.R. 358, 399 (Bankr. N.D. Tex. 2011).

Equitable tolling may apply when the defendant's active or passive concealment prevented the plaintiff from discovering their identity sooner. *Tow v. Bulhman (In re ATP Oil & Gas Corp.)*, No. 12-36187, 2017 WL 2123867, at *4 (Bankr. S.D. Tex. May 16, 2017); *Hill v. Oria (In re Juliet Homes, LP)*, No. 07-36424, 2010 WL 5256806, at *11 (Bankr. S.D. Tex. Dec. 16, 2010). The statute of limitations may also be equitably tolled if the plaintiff was delayed by extraordinary circumstances. *ATP*, 2017 WL 2123867, at *4. If the defendant actively concealed information, the statute of limitations does not begin to run until the plaintiff gained actual knowledge of the cause of action. *Juliet Homes*, 2010 WL 5256806, at *11. If the defendant passively concealed information, "the statute of limitations begins to run when the Trustee either acquired or should

---

[10] The parties hotly dispute the application of equitable tolling. It is not a straightforward matter: "We said that statute of limitations law is confusing, and now you'll believe us! And we're not through." *Wolin v. Smith Barney Inc.*, 83 F.3d 847, 852 (7th Cir. 1996), disapproved of by *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997).

have acquired actual knowledge of the existence a cause of action."[11]   *Id.*   If the defendant

passively concealed information or if the plaintiff was delayed by extraordinary circumstances, the

plaintiff must exercise reasonable diligence to discover the fraud.   *Id.*

### A.     Extraordinary Circumstances

An "extraordinary circumstance . . . derives from some external obstacle to timely filing

beyond the plaintiff's control, not from self-inflicted delay." *Costellow v. Becht Eng'g Co., Inc.*,

2020 WL 8271875, *1–2 (E.D. Tex. Dec. 16, 2020) (quoting *Sehr v. Val Verde Hosp. Corp.*, 368

F. Supp. 3d 1106, 1108 (W.D. Tex. 2019)).   For example, the delay caused by the time required

for a court to rule on a motion is an extraordinary circumstance.   *Yahraes v. Rest. Assocs. Events*

*Corp.*, No. 10-CV-935 SLT, 2011 WL 844963, at *2 (E.D.N.Y. Mar. 8, 2011).   Courts also find

extraordinary circumstances when a plaintiff is denied discovery.[12]   *See Green v. Doe*, 260 Fed.

App'x. 717, 719 (5th Cir. 2007) (per curiam) (finding equitable tolling to be warranted when a

plaintiff filed a complaint well within the statute of limitations period and was twice denied

discovery of the identity of unknown defendants); *Cowart v. Erwin*, No. 3:10-CV-1800-G BN,

2013 WL 3970790, at *6 (N.D. Tex. Aug. 2, 2013) ("That this Court did not permit discovery prior

to summary dismissal indicates that equitable tolling should apply to Plaintiffs [*sic*] claims.");

*Heckford v. City of Pasadena*, No. 4:20-CV-4366, 2021 WL 2517405, at *2 (S.D. Tex. June 18,

2021) (finding equitable tolling warranted where a plaintiff "made four requests for disclosure of

---

[11] *Juliet Homes* only outlines when the statute of limitations should run if there is concealment.  See *Juliet Homes*, 2010 WL 5256806, at *11.  Similar to passive concealment, extraordinary circumstances require that the Trustee be diligent.  *See id.* at 12.  It follows that the statute of limitations begins to run when the Trustee either acquired or should have acquired actual knowledge of the existence of a cause of action.

[12] The test appears to be whether injustice will result if a plaintiff is prohibited from bringing claims against parties that she would have been able to identify within the statute of limitations period but for a court order which prohibited her from doing so.  Put differently, was the plaintiff without a legal remedy to avoid the consequences of the statute of limitations? *See Thomas v. City of Kingsville, Tex.*, No. 2:18-CV-136, 2020 WL 1660102, at *2 (S.D. Tex. Apr. 1, 2020).

[John Doe] identities, . . . all several months prior to the expiration of the limitations period.");

*Carrillo Rivera v. ManpowerGroup US, Inc.*, No. EP-19-CV-00299-DCG, 2020 WL 5913832, at

*8 (W.D. Tex. Oct. 6, 2020); *cf. Balle v. Nueces Cnty., Tex.*, 952 F.3d 552, 558 (5th Cir. 2017)

(determining that equitable tolling was not warranted when the complaint was filed just days

before the end of the statute of limitations and the inability to timely determine the identities of

other defendants was attributable to the decision to file the suit so close to the end of the limitations

period).

In the February 6, 2019 scheduling conference, the Trustee requested "some initial

discovery, interrogatories identifying the ownership structure, basic documents, which should not

be voluminous, regarding the investments that they made in the PPBE opportunities funds." (ECF

No. 35 at 6). The Court denied the initial discovery because "large portions of [the complaint] are

going to fall under Rule 9, I think. And the general law is you don't open discovery about Rule 9

complaints until the Court test[s] whether the Rule 9 complaint meets the who, what, when,

where." (ECF No. 35 at 9–10). The Trustee argued that Rule 9 would not apply to the § 550

claim, and the initial discovery "would allow us to at least identify who are the owners." (ECF

No. 35 at 10). The Court determined that identifying its owners would be part of Twosons' initial

disclosure duty, and so discovery was not necessary:

> [A]ll of that's part of their initial disclosure duty, right? . . . So, I mean, we don't
> need to send them discovery. They have an initial disclosure duty on that. . . .
> [L]et's go ahead and do initial disclosures. I think he does need to know, you know,
> who he's actually dealing with, things of that nature.

(ECF No. 35 at 10). Twosons did not indicate that it would not identify its owners in its initial

disclosures after the Court asked if it was missing something about initial disclosures. (ECF No.

35 at 11). Ultimately, the Court allowed the parties to agree to any discovery to which they would

voluntarily agree, and any party was "free to seek an order if you can't get an agreement from the other side for exigent type discovery, if you identify a situation that arises."  (ECF No. 35 at 14).

Federal Rule of Civil Procedure 26(a) does not require that a corporate party reveal the identity of its individual owners.  FED. R. CIV. P. 26(a).  Twosons did not disclose its owners in its initial disclosures, which were served on May 20, 2019.  (*See* ECF No. 82-10).  Notably, the initial disclosures were served a week after the Trustee received documents from the Joint Liquidators. Even if Twosons had identified its owners in its initial disclosures, that disclosure would not have aided the Trustee.  The question remains, however, if the Court prevented the Trustee from discovering the Hararis and whether they were subsequent transferees by denying the limited discovery.  The Court's rationale for denying the limited discovery was that the Trustee would discover the owners' identity and whether they were subsequent transferees through the initial disclosures.  This turned out not to be true.  If the Court had allowed the Trustee to submit written interrogatories, Twosons would have had 30 days to respond.  FED. R. CIV. P. 33(b)(2).  If the Trustee had submitted the interrogatories on February 6, 2019, the Trustee would have a response by March 8, 2019, which more than two months before the Trustee was able to discover the Hararis' identity and role as subsequent transferees through the Joint Liquidators on May 13, 2019.[13]  The Court's assumption left the Trustee without a legal remedy to avoid the statute of limitations and constitutes an extraordinary circumstance.[14]

---

[13] This would still have been a month prior to the Trustee getting any confirmation that Raphael and Fabrice own Twosons: "The Trustee did not learn that the Hararis were the owners of Twosons until approximately April-May 2019" and "[The Defendants] did not identify [Raphael and Fabrice] verbally until time of mediation with Judge Gerber in April 2019."  (ECF Nos. 73 at 36; 91 at 9).

[14] The Trustee filed a motion to amend the complaint 25 days after the statute of limitations period.  If the Trustee had known that the Hararis owned Twosons two months earlier, it seems likely that the Trustee would have filed the motion for leave to amend within the statute of limitations period.

###### B.     Diligence

If a plaintiff was delayed by extraordinary circumstances, the plaintiff still must demonstrate that she was diligent in attempting to identify the cause of action before the expiration of the limitations period.  *ATP*, 2017 WL 2123867, at *4; *Juliet Homes*, 2010 WL 5256806, at *12.  The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence.  *Holland v. Florida*, 560 U.S. 631, 653 (2010); *see also Rogers v. Buchanan*, 2015 WL 5772203, *9 (N.D. Tex. Aug. 4, 2015) ("[T]he Court's analysis of this plaintiff's due diligence is not limited to how soon before the close of the limitations period he began to pursue remedies in this Court. To hold otherwise would too harshly apply the statute of limitations and condone a race to the courthouse, to file bare-bone complaints and bring clearly unexhausted claims."); *Gibbs v. Legrand*, 767 F.3d 879, 893 (9th Cir. 2014) ("That Gibbs took slightly more than two months to prepare his federal habeas petition . . . after diligently pursuing his rights for ten years, does not undercut his overall record of diligence.").  Diligence is measured by an objective standard.[15]  *Markus v. Fried (In re Geneva Steel LLC)*, 389 B.R. 231, 240 (Bankr. D. Utah 2008).

To the extent diligence is synonymous with hard work, it cannot be said that the Trustee failed to exercise diligence.  The Department of Justice and the Platinum receiver, both of whom had access to information about Platinum, stonewalled the Trustee.  (ECF No. 82-11 at 3).  The Trustee learned of Twosons on October 2, 2018 from a response to one of the fourteen subpoenas

---

[15] *Juliet Homes* uses a bright-line rule for diligence: "The Court must determine whether the Trustees discovered or should have discovered that the alleged fraud occurred, but nonetheless failed to file a timely suit." *Juliet Homes*, 2010 WL 5256806, at *13.  As discussed below, bright-line rules like this are too narrow in the equitable tolling context.  For example, a plaintiff could be diligent in attempting to discover information, but actually discovers (or should have discovered) the information the day before the statute of limitations period expires.  This leaves a plaintiff in the untenable position of filing a bare-bones complaint and racing to the courthouse if she wants to bring a claim before she is barred by the statute of limitations.

he served concerning PPBE investors.  (ECF No. 82-11 at 4).  The Trustee then filed the original complaint on November 18, 2018, approximately two months after learning of Twosons' existence and seven months before the expiration of the limitations period.  (ECF No. 82-11 at 5).  The parties tried to mediate the case between February 28, 2019 and May 22, 2019.  The Joint Liquidators had access to Platinum information as of "the second or third quarter of 2018," but were adverse to the Trustee until a settlement was reached in March 2019.  (ECF No. 82-11 at 3–4).  The Trustee served a subpoena on the Joint Liquidators on March 15, 2019, who then produced documents permitting the Trustee could evaluate claims against the Hararis on May 13, 2019.  (ECF No. 82-11 at 4).

The Trustee worked diligently to discover the identity of Twosons' owners and information sufficient to bring a claim against them.  While the Trustee possibly should have discovered (i) that the Hararis were Twosons' owners and (ii) sufficient information to bring claims against the Hararis as subsequent transferees prior to June 27, 2019, the Court finds that the Trustee was diligent.  *See Gibbs*, 767 F.3d at 893; *Rogers*, 2015 WL 5772203, *9 ("[T]he Court's analysis of this plaintiff's due diligence is not limited to how soon before the close of the limitations period he began to pursue remedies in this Court.").

The Defendants make much of statements this Court made in *Juliet Homes* and *ATP*.  Specifically, the Defendants rely on the statement that equitable tolling is unavailable if the Trustee had enough information to bring a claim prior to the expiration of the limitations period.  *Juliet Homes*, 2010 WL 5256806, at *13 ("If the underlying facts should have been discovered before the limitations period had ended, equitable tolling is not appropriate" and "[t]he Court must determine whether the Trustees discovered or should have discovered that the alleged fraud occurred, but nonetheless failed to file a timely suit."); *ATP*, 2017 WL 2123867, at *4 ("[T]he

trustee must demonstrate that despite exercising diligence, he could not have discovered the identity of the movant defendants prior to the expiration of the limitations period."). The Court's holdings in *Juliet Homes* and *ATP* were based on the lack of concealment, extraordinary circumstances, and diligence, not because the plaintiff learned of its claims during the limitations period and did not sue until after limitations expired.[16] If this rule were universally true, defendants would be incentivized to resist discovery until the night before the statute of limitations and only then reveal the pertinent information. So long as the plaintiff had discovered the identity prior to the expiration of the limitations period, the plaintiff would be barred from equitable tolling. This rule perversely incentivizes bare-bones filings and unscrupulous discovery practices and ultimately makes it more difficult for plaintiffs to expeditiously assert claims. These outcomes should not be encouraged. At least one other court has determined that the bright-line rule preventing equitable tolling if underlying facts were discovered is too narrow. *See Milby v. Templeton (In re Milby)*, 875 F.3d 1229, 1233 (9th Cir. 2017) ("[T]he bankruptcy court erred insofar as it held that failing to file a complaint after extraordinary circumstances cease but before the limitations period would normally expire is dispositive of whether equitable tolling applies. That rule is too narrow."). Lastly—and as evidenced by the facts of this case—equitable tolling does not lend itself to bright-line rules. *Clarke*, 721 F.3d at 344. Thus, the Court declines to extend the bright-line rule espoused in *Juliet Homes* and *ATP*.

In the Court's view, exercising the power to equitably toll the limitations period in this suit is consistent with the admonition that it be used "sparingly." The Court left the Trustee without a

---

[16] The *Juliet* plaintiff had documents showing the transfers more than a year in advance, failed to contact the Debtor's accountants, and delayed sending subpoenas to third-parties from whom the information could be obtained. *Juliet Homes*, 2010 WL 5256806, at **14–15. The *ATP* plaintiff failed to recognize that a "Cede breakdown can be obtained in a matter of minutes through 'DTC's website or by calling the DTC 'Proxy Services Hotline.''''" 2017 WL 2123867, at *5.

legal remedy by denying discovery and injustice will result if the Trustee is now prohibited from bringing claims. After applying equitable tolling, the Trustee's motion to amend the complaint on July 22, 2019 was timely filed.[17]   The motion to dismiss Count IV is denied.[18]

## IV.   CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS AND BREACHES OF FIDUCIARY DUTY

The Trustee asserts claims for conspiracy to commit fraudulent transfers and breaches of fiduciary duty. (ECF No. 56 at 88–89). The Defendants assert that the conspiracy claims (i) fail to set forth a short and plain statement of the claim showing that the pleader is entitled to relief under Federal Rule of Civil Procedure 8;[19] (ii) do not identify what misconduct the Defendants engaged in "relating to the alleged wrongdoings committed by Black Elk, Platinum and its insiders"; and (iii) improperly lump multiple defendants together. (ECF Nos. 62 at 28–30).

Common law conspiracy has the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & ERISA Litig.)*, 623 F. Supp. 2d 798, 809 (S.D. Tex. 2009). Conspiracy liability extends beyond the "active wrongdoer" to reach parties that plan, assist, or encourage the wrongdoer's acts. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925–26

---

[17] Even if the Court's ruling that "equitable tolling due to extraordinary circumstances causes the period of limitations to start once the plaintiff discovers or should discover the cause of action" is incorrect, tolling for 66 days—the period between the earliest date the Trustee would have received answers to his interrogatories if he immediately sent a discovery request (March 8, 2019) to the date the Trustee first received information sufficient to bring a claim against the Hararis (May 13, 2019)—is still sufficient for the motion for leave to amend to be timely filed.  *See Sehr*, 368 F.Supp.3d at 1109–1110 (tolling a limitations period 56 days when the Court spent that time considering a stipulation).

[18] Because the Court finds the presence of an extraordinary circumstance and that the Trustee acted diligently, the Court need not assess active or passive concealment.

[19] Whether Rule 9(b)'s heightened pleading standard applies to a claim for conspiracy to commit fraudulent transfer remains undecided under Fifth Circuit precedent.  However, the Trustee identifies sufficient evidence to support an allegation that the Hararis conspired to commit a fraudulent transfer under both Rule 8(a) and 9(b).

(Tex. 1979). Thus, liability can attach with respect to wrongful conduct by the conspiracy, even if the individual did not directly participate in each particular act that is alleged to have caused injury. *Enron*, 623 F. Supp.2d at 813 (quoting *Carroll*, 592 S.W.2d at 928).

At the pleading stage, a plaintiff alleging a conspiracy need only state enough facts "to raise a reasonable expectation that discovery will reveal evidence of" an illegal agreement. *Twombly*, 550 U.S. at 556. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Conspiracies are "rarely evidenced by explicit agreements, but nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (quoting *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976)). "Civil conspiracy may be proven entirely by circumstantial evidence." *Farouk Sys., Inc. v. Chi Herbal Infusions, Inc.*, 2009 WL 10676778, *3 (E.D. Tex. Sept. 2, 2009).

Conspiracy pleadings are sufficient "if they set forth facts from which an inference of unlawful agreement can be drawn" because "[p]laintiffs cannot be required to plead with specificity the very facts which can only be proven by circumstantial evidence." *Brett v. First Fed. Sav. & Loan*, 461 F.2d 1155, 1158 (5th Cir. 1972) ("Actual agreements are seldom capable of proof by direct testimony and thus circumstantial evidence may be allowed to establish an alleged conspiracy."); *see Jernigan v. Wainer*, 12 Tex. 189, 193 (1854) ("When men enter into conspiracies, they are not likely to call in a witness. They resolve their schemes clandestinely and in secret."). Consequently, the element that a meeting of the minds has occurred may be established by "proof showing concert of action or other facts and circumstances from which the

natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators." *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963). "It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence . . . ." *Id.* at 582.

The Trustee has plausibly alleged that the Defendants encouraged Platinum and its affiliates to subordinate the Noteholders' interests by making false representations that they were disinterested to obtain consent leading to damages. For instance, the Trustee alleges that the Defendants (i) discussed investment options with Platinum principals; (ii) had close business relationships with Platinum and its principals; (iii) invested with Platinum despite several red flags; (iv) worked with Platinum to find solutions when Platinum was unable to redeem Harari or Twosons investments; (v) relied on the fact that Platinum controlled Black Elk in making their investments; and (vi) made demands for redemption of the Black Elk preferred equity investment prior to the Renaissance Sale, yet refrained from exercising their put option or taking other action against Platinum. (*See* ECF Nos. 56 at 29, 30, 31, 35, 59, 66, 67; 56-37; 56-49 at 1). The Trustee's claims set forth sufficient circumstantial evidence to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement. Ultimately, the Trustee has satisfied the requirement of a short, plain statement which demonstrates that the Trustee is entitled to the requested relief. *Twombly*, 550 U.S. at 556; (ECF No. 56 at 88–89).

Second, the Defendants argue that the Amended Complaint impermissibly lumps the Defendants together. (ECF No. 62 at 26, 32). The Trustee describes in detail Platinum and Beechwood's alleged scheme to subordinate the Noteholders' interest in favor of Platinum. (ECF No. 56 at 39–46). The Trustee also alleges enough circumstantial evidence to state a plausible

claim that the Hararis encouraged the Renaissance Sale and subsequent transfers.  (*See* ECF Nos. 56 at 29, 30, 31, 35, 59, 66, 67; 56-37; 56-49 at 1).  The Defendants argue that "[the Trustee's] inability to distinguish the allegedly wrongful conduct of Twosons and the Hararis on grounds independent of other individuals and/or entities prevents Twosons, the Hararis, and this Court from understanding what specific role Twosons or the Hararis allegedly played."  (ECF No. 62 at 33). On the contrary, the Amended Complaint plausibly alleges that the Hararis knew of and encouraged Platinum to order the Renaissance Sale to receive their promised returns when the Platinum entities were struggling to make returns.  The Trustee sufficiently specified the Hararis' role, both in their personal capacities and as representatives of Twosons, in the fraudulent transfer conspiracy.

Lastly, the Defendants argue that the Trustee is not entitled to punitive damages because the allegations fall short of what is necessary for a punitive damages claim.  (ECF No. 62 at 39–40).  The Trustee requests punitive damages "because of the intentional, willful and wanton, reckless and malicious nature of Defendants' actions."  (ECF No. 56 at 89).  "Malice" is "a specific intent by the defendant to cause substantial injury or harm to the claimant."  TEX. CIV. PRAC. & REM. CODE § 41.001(7).  The Trustee has alleged that the Defendants engaged in a scheme to transfer the Renaissance Sale proceeds out of Black Elk.  (ECF No. 56).  This was the nail in the coffin for Black Elk.  (ECF No. 56 at 82).  The Trustee may proceed with the punitive damages claim.  The motion to dismiss Count V is denied.

## V.    VEIL PIERCING AND ALTER EGO

The Trustee seeks to pierce the corporate veil between Twosons and the Hararis.  (ECF No. 56 at 89–90).  If the Trustee pierces the veil, he alleges the Hararis would be individually and jointly and severally liable for Twosons' liabilities to Black Elk.  (ECF No. 56 at 90).

The Defendants argue that Panamanian substantive law governs the veil piercing claim, while the Trustee believes federal or Texas substantive veil piercing law governs.  (ECF Nos. 62 at 22; 73 at 23).  A choice of law inquiry traditionally occurs as a two-step process.  The Court must first determine whether federal or state choice of law rules govern.  *Wilmington Sav. Fund Soc'y v. iHeartCommunications, Inc. (In re iHeartMedia, Inc.*), 597 B.R. 339, 350 (Bankr. S.D. Tex. 2019) ("Courts confronted with a choice of law issue in the context of bankruptcy must decide whether to apply federal law or the law of the forum.").  Once the Court has determined which choice of law rules apply, it must apply these rules to the facts of the case to determine the appropriate substantive laws.  *Tow v. Rafizadeh (In re Cyrus II P'ship)*, 413 B.R. 609, 613 (Bankr. S.D. Tex. 2008).  However, the Amended Complaint plausibly meets the Panamanian veil piercing standard, so there is no need to engage in a choice of law analysis at this stage.

In determining Panamanian veil piercing law, the Court may consider any relevant material or source, whether or not submitted by a party or admissible under the Federal Rules of Evidence. FED. R. CIV. P. 44.1; *Panam*, 2011 WL 3423338, at *4; *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 291 (S.D.N.Y. 2008) ("When determining foreign law, courts 'may consider any relevant material or source,' including determinations by other courts.").  In *Panam Management Group, Inc. v. Pena*, the court applied New York's choice of law doctrine, which dictates that "the law of the state of incorporation determines when the corporate form will be disregarded," to conclude that Panamanian law governed a veil piercing claim.  *Panam*, 2011 WL 3423338, at *3.   After consulting the Commercial Code of the Republic of Panama, other Panamanian laws, and expert witnesses, the *Panam* court determined that veil piercing under Panamanian law is "an exceptional measure."  *Id.* at *5.  The corporate veil may be pierced under Panamanian law when "directors or shareholders controlled and used the corporation for the sole purpose of perpetrating fraud or

'violating the law,' thereby abusing the corporate form and hiding behind it to avoid liability." *Id.* ("In sum, the Court concludes that Yuma Bay's corporate veil cannot be pierced under Panamanian law because plaintiff has failed to either allege that Yuma Bay was created for the purpose of perpetrating fraud or that the individual defendants abused the corporate form to perpetrate that fraud.").

To survive the motion to dismiss, the Amended Complaint must state a plausible claim under Panamanian veil piercing law. To do so, the Amended Complaint must plausibly allege that the Hararis controlled and used Twosons for the sole purpose of perpetrating fraud or "violating the law." *Id.* at *5. In response to the motion to dismiss, the Trustee identifies several portions of the Amended Complaint that collectively state a plausible veil piercing claim under the Panamanian standard.

The Amended Complaint alleges that Twosons (i) has no apparent business, public presence or information, functioning board of directors, or employees; (ii) did not adhere to corporate formalities; (iii) combined the Hararis' personal investments to Platinum with investments made by Twosons; (iv) was incorporated with the Mossack Fonseca law firm, which is currently being wound down after a Panamanian investigation, raid, and arrests for allegedly "hiding money assets from suspicious origins"; (v) utilized bearer shares in an attempt to shroud ownership identity; (vi) distributed all ordinary business income and profits to the Hararis; and (vii) was undercapitalized and is now an empty shell.[20]   (ECF No. 56 at 21–26, 36, 90). Significantly, the Amended Complaint also alleges that the corporate form was involved in the alleged conspiracy. (ECF No. 56 at 90). When the Hararis allegedly encouraged Platinum to

---

[20] The Court recognizes that the use of bearer shares or the Mossack Fonesca firm are not definite indicators of using the corporate form for an improper purpose. Taken in context with other allegations, however, they can be read as possible indices of using the corporate form for an improper purpose.

engage in fraud, thereby engaging in a conspiracy, the Trustee has plausibly alleged that the Hararis used Twosons for the sole purpose of violating the law.[21]   The motion to dismiss Count VI is denied.

## CONCLUSION

A separate order will be entered.

SIGNED 05/19/2022

_____
Marvin Isgur
United States Bankruptcy Judge

---

[21] Accepting the well-plead allegations as true, the Trustee has alleged that Twosons has no apparent purpose other than to provide legal cover for the Hararis.  When there is no other purpose than to provide legal cover for the Hararis, and the corporate form was used in the commission of a conspiracy, it is plausible that the Hararis used Twosons for the sole purpose of violating the law.